NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

GUARDIAN AD LITEM FOR P.T.,
*Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY,
*Appellee.*

No. 1 CA-JV 19-0229
FILED 12-19-2019

Appeal from the Superior Court in Yavapai County
No. P1300JD201800046
The Honorable Anna C. Young, Judge

**AFFIRMED**

COUNSEL

Law Office of Florence M. Bruemmer, PC, Anthem
By Florence M. Bruemmer
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee DCS*

---

## MEMORANDUM DECISION

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

J O H N S E N, Judge:

¶1 P.T.'s guardian ad litem ("GAL") appeals the superior court's order granting a motion by the Department of Child Safety ("DCS") to change physical custody of P.T. from a licensed foster family ("Foster Parents") to her paternal grandparents ("Grandfather" and "Grandmother," collectively "Grandparents"). For the following reasons, we affirm.[1]

### FACTS AND PROCEDURAL BACKGROUND

¶2 We view the facts in the light most favorable to upholding the superior court's findings. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002). P.T. was born in May 2018 to Melissa and Jeremiah, who had a history of domestic violence and substance abuse. A month later, Grandfather drove Jeremiah from California to Arizona so Jeremiah could surrender to the court on pending criminal charges. Before Jeremiah's court appearance, Grandfather drove him to visit Melissa; this visit violated an order of protection Melissa's mother had obtained against Jeremiah. After dropping Jeremiah off at the courthouse, Grandfather returned to California. The hearing was continued, and Jeremiah stayed at a nearby hotel, where he and Melissa used methamphetamine together and

---

[1] The GAL objected to DCS's motion to change custody, then filed a notice of appeal from the superior court's order granting the motion. Upon filing the notice of appeal, the GAL asked the superior court to appoint appellate counsel because the GAL's county contract does not include appellate work. In granting that motion, the court mistakenly ordered appointment of counsel for the child, not for the GAL (or as the GAL). *See* Ariz. R.P. Juv. Ct. 40(A) ("The guardian ad litem may be an attorney, volunteer special advocate or other qualified person."). We construe the order to conform to the GAL's motion, and at the same time, *sua sponte* correct our caption to properly reflect that the appellant is the GAL rather than the infant child.

got into a physical altercation while P.T. was present. DCS removed P.T. and eventually placed her with Foster Parents.

¶3 After the superior court terminated Melissa and Jeremiah's parental rights to P.T. in August 2018, Foster Parents and Grandparents both became interested in adopting P.T. The court ordered supervised visits for Grandparents, who live in California. The court also ordered an expedited Interstate Compact on the Placement of Children ("ICPC") to evaluate whether Grandparents would be a suitable placement for the child. Grandparents began visiting P.T. about once a month in Arizona and brought P.T.'s two paternal half-sisters to meet her. California approved the ICPC in March 2019.

¶4 Two months later, in May 2019, DCS moved the superior court to change physical custody of P.T. to Grandparents. After holding an evidentiary hearing and taking the matter under advisement, the court granted DCS's motion, finding that moving P.T. to Grandparents' custody was in her best interests.

¶5 P.T.'s GAL timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2019) and 8-235(A) (2019).[2] *See also Antonio P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 402, 404, ¶ 7 (App. 2008) (order changing custody of dependent child is final, appealable order).

## DISCUSSION

¶6 We review placement orders of dependent children for an abuse of discretion. *Id.* at ¶ 8. "Juvenile courts have substantial discretion when placing dependent children because the court's primary consideration in dependency cases is the best interest of the child." *Id.* Because the superior court is "in the best position to weigh the evidence," we will defer to its factual findings unless "no reasonable evidence" supports them, *Jesus M.*, 203 Ariz. at 280, ¶ 4, and will not reweigh the evidence, *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018). We review questions of law *de novo*. *Jeff D. v. Dep't of Child Safety*, 239 Ariz. 205, 207, ¶ 6 (App. 2016).

---

[2] Absent material revision after the relevant date, we cite the current version of a statute or rule.

**A.     The Superior Court's Best-Interests Finding.**

**¶7**          The GAL argues the superior court erred in changing physical custody to Grandparents because there was no reasonable evidence supporting the court's finding that the change was in P.T.'s best interests.

**¶8**          In considering the GAL's contention, we first note the court appropriately considered the placement preferences in context of P.T.'s overall best interests as required by A.R.S. § 8-514(B) (2019).  Section 8-514(B) provides, in relevant part:

> The department shall place a child in the least restrictive type of placement available, consistent with the best interests of the child.  The order for placement preference is as follows:
>
> 1.  With a parent.
>
> 2.  With a grandparent.
>
> 3.   In kinship care with another member of the child's extended family, including a person who has a significant relationship with the child.   A foster parent or kinship caregiver with whom a child under three years of age has resided for nine months or more is presumed to be a person who has a significant relationship with the child.

"[T]he order of placement is a preference, not a mandate," but requires the superior court to include placement preference in its best-interests analysis. *Antonio P.*, 218 Ariz. at 405, ¶ 12.

**¶9**          Consistent with these principles, the court found that although Foster Parents had a "significant relationship" with P.T. under § 8-514(B)(3) because P.T. had lived with them for at least nine months and was under three years old, Grandparents nonetheless were a preferred placement under § 8-514(B)(2).  The court also properly acknowledged P.T.'s best interests were "[t]he overarching concern in determining" her placement under § 8-514.

**¶10**          The court acknowledged that Foster Parents loved and took "wonderful care" of P.T., but found that Grandparents also loved P.T. and diligently traveled to Arizona to visit and "establish a relationship" with her.  The court further explained that placing P.T. with Grandparents would "allow [her] to be placed with family and to have a relationship with

her extended family, including the two half-sisters that the grandparents brought to Arizona to meet [P.T.]."

¶11 The record amply supports the court's findings. Grandmother called the DCS hotline to speak with P.T.'s case manager less than a week after Melissa and Jeremiah's domestic-violence incident. In addition, DCS documented nine times Grandparents visited P.T. within a six-month period and noted that the visits were "very positive." According to DCS records, P.T. seemed "very happy" with her half-sisters and appeared to form an "instant connection" with them. DCS observed that Grandparents were protective of P.T. and that P.T. was "very loved" by them. One of P.T.'s half-sisters even asked the supervising DCS case aide at one visit to "tell the Judge that we want [P.T.] to live with us."

¶12 The GAL, however, argues that the various concerns she expressed to the superior court undermine the court's best-interests finding. Specifically, the GAL points to (1) an Oklahoma court's decision not to place two of P.T.'s older siblings with Grandparents, (2) Grandfather's 2016 domestic-violence conviction, and (3) Grandparents' alleged boundary issues with Jeremiah.

¶13 The superior court explicitly addressed the first two issues, explaining:

> The court acknowledges the concerns of the Guardian ad Litem regarding the grandparents not being placement for [P.T.'s] siblings who were adopted out of an Oklahoma dependency case, but there is no evidence that the grandparents were found to not be appropriate, just that the court in Oklahoma decided not to move the children from their placement in Oklahoma. Unlike this situation with [P.T.], there was no ICPC study conducted and there is no evidence that the grandparents were able to travel to see those children. Additionally, the court has considered the concerns of [the DCS investigator] during the investigation and of the Guardian ad Litem regarding the 2016 domestic violence conviction. However, the court finds that upon further information and after having reviewed the exhibits admitted into evidence, that those concerns do not rise to the level of excluding the grandparents as a possible placement.

¶14 The record supports the superior court's findings that the concerns the GAL cited did not preclude placing P.T. with Grandparents.

First, as the court noted, nothing in the record shows that the Oklahoma court decided Grandparents were an inappropriate placement. Rather, the evidence shows only that an ICPC was never completed and the Oklahoma judge ordered the children to remain in their current placement.

¶15 Second, the court did not abuse its discretion by concluding that, based on the record, the 2016 domestic-violence incident did not preclude Grandparents as a placement. Grandfather disclosed during the ICPC process that he "pushed past his wife" during an argument about Jeremiah's substance abuse and it "was witnessed by law enforcement." After he was charged in connection with the incident, he pled guilty to disturbing the peace, attended a 52-week domestic-violence and anger-management program, and as of the date the ICPC report was created, Grandfather was "continu[ing] to attend support groups and counseling." Grandparents also stated this was the only domestic-violence incident in their long relationship and they had learned from it.

¶16 Third, the record shows Grandparents have taken measures to address any boundary issues they might have with Jeremiah. Grandfather had previously obtained an order of protection against Jeremiah, and nothing suggests he would fail to do so again if necessary. Grandparents also have shown respect for P.T.'s half-sisters' wishes to avoid contact with their father.

¶17 Further, though Grandmother admitted she had "enabl[ed]" Jeremiah in the past, she has since taken steps to "better handle" Jeremiah's addiction and has made clear that "her grandchildren come first." She began consulting with a life coach who has worked with her on family addiction issues and creating "healthy boundaries and relationships." Her life coach confirmed Grandmother is committed to developing new habits for handling her dealings with Jeremiah. And, although a DCS investigator at first was concerned that Grandfather knew about the order of protection when he took Jeremiah to visit Melissa and purportedly paid for the hotel where the altercation occurred, *see supra* ¶ 2, during further investigation, Jeremiah confirmed Grandfather neither knew about the order nor paid for the hotel.

¶18 To the extent the superior court did not explicitly consider Grandparents' alleged boundary issues with Jeremiah, the court made clear in its ruling that it "considered the testimony presented, the record in this matter and the exhibits admitted into evidence." We infer the court considered the evidence in the record and reasonably found it did not exclude Grandparents as the best placement for P.T. *See Pima County*

*Severance Action No. S-1607*, 147 Ariz. 237, 238 (1985) ("[T]he juvenile court will be deemed to have made every finding necessary to support the judgment."). The superior court gave due consideration to the GAL's concerns, and we do not reweigh the evidence it considered. *See Alma S.*, 245 Ariz. at 151, ¶ 18.

**¶19** Finally, the GAL argues P.T. was bonded with Foster Parents, that they were "basically the only parents she had known," and there was "no need to break the bond" between them. But P.T.'s therapist opined P.T. could "successfully transition[] to her grandparents' care" and P.T.'s team could "mitigate the negative effects of [any] disruption through careful and thoughtful transition planning." This evidence reasonably supports the court's decision to change custody.

**¶20** In sum, we conclude reasonable evidence supported the superior court's best-interests finding, and accordingly, the court did not abuse its discretion by granting DCS's motion to change physical custody of P.T. to Grandparents.

**B.     Factors Under A.R.S. § 8-103(C).**

**¶21** The GAL further argues the court should have considered the seven factors under A.R.S. § 8-103(C) (2019) because it was deciding P.T.'s "permanent placement for the purposes of adoption." Section 8-103(C) provides:

> Pursuant to rules adopted by the department, the department or adoption agency shall place a child in an adoptive home that best meets the safety, social, emotional, physical and mental health needs of the child. Other relevant factors for consideration, in no order of preference, shall include:
>
> 1.     The marital status and the length and stability of the marital relationship of the prospective adoptive parents.
>
> 2.     Placement with the child's siblings pursuant to § 8-862.
>
> 3.     Established relationships between the child and the prospective adoptive family as described in § 8-862, including placement with a grandparent or another member of the child's extended family, including a person or foster parent who has a significant relationship with the child.

7

4.    The prospective adoptive family's ability to meet the child's safety, social, emotional, physical and mental health needs and the ability to financially provide for the child.

5.    The wishes of the child who is twelve years of age or older.

6.    The wishes of the child's birth parents unless the rights of the parent have been terminated or the court has established a case plan of severance and adoption.

7.    The availability of relatives, the child's current or former foster parents or other significant persons to provide support to the prospective adoptive family and child.

¶22    Assuming for purposes of argument that the superior court was required to consider these factors, it implicitly did so. *See No. S-1607*, 147 Ariz. at 238. As noted above, *see supra* ¶ 10, the court explained that placing P.T. with Grandparents would allow her to bond with her family and that Grandparents were loving and appropriate and have nurtured a relationship with P.T. Of the four factors that appear to apply in this case, *see* A.R.S. § 8-103(C)(1), (3)-(4), (7), the record reasonably supports the court's implicit finding that the factors weighed in favor of placing P.T. with Grandparents. No error occurred.

## CONCLUSION

¶23    For the foregoing reasons, we affirm the superior court's order granting DCS's motion to change physical custody of P.T. to Grandparents.

